CHRYSLER CORPORATION, Relator,

v.

The Honorable Robert BLACKMON,
Judge, Respondent.

No. D–1637.

Supreme Court of Texas.

Oct. 14, 1992.

Rehearing Overruled Dec. 31, 1992.

Ronald B. Brin, Richard W. Crews, Jr., Corpus Christi, Richard A. Salomon, Chicago, Ill., Richard Josephson, Dallas, Travis J. Sales, Houston, Joe R. Greenhill and Bob E. Shannon, Austin, for relator.

David L. Perry, Mikal C. Watts, Corpus Christi, Franklin S. Spears, San Antonio, Charles B. Lord, C.L. Ray, Austin and Elaine Stone, Corpus Christi, for respondent.

## OPINION

CORNYN, Justice.

In this product liability suit, Chrysler Corporation seeks a Writ of Mandamus directing the Honorable Robert Blackmon, Judge of the 117th District Court, Nueces County, Texas, to vacate his Order Regarding Plaintiffs' Amended Motion for Sanctions Against Chrysler for Discovery Abuse (Sanctions Order) by which he struck Chrysler's pleadings and rendered a default judgment against Chrysler on all issues of liability for both compensatory and punitive damages.[1] Chrysler claims that the trial court's Sanctions Order violates the standards for the imposition of "death penalty" discovery sanctions, those that terminate the presentation of the merits of a party's claims, that we recently adopted in *Transamerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913 (Tex.1991, orig. proceeding) and *Braden v. Downey*, 811 S.W.2d 922 (Tex.1991, orig. proceeding).

Ambrocio Garcia Jr. was killed on July 26, 1986, when a drunk driver drove across the median and hit Garcia's Dodge Diplomat head-on. Garcia's family filed this wrongful death suit against Chrysler and the estate of the driver, alleging, among other things, that the Dodge Diplomat was defective because it was not crashworthy.

The parties acknowledge that the standards for appellate review of discovery sanctions announced in *Transamerican Natural Gas Corp. v. Powell* and *Braden v. Downey* control this proceeding, including a party's right to mandamus relief if a violation of those standards is demonstrated.[2] We consider, then, whether the record demonstrates a violation of those standards.

### I.

This record painfully illustrates the problems of modern discovery practice and the attendant expenses and difficulties of judicial administration, at all levels, especially in complex litigation. From April 10, 1989, when the Garcias served Chrysler with their first request for discovery, until August 8, 1991, when the trial court granted a default judgment against Chrysler on liability, the Garcias served five discovery requests on Chrysler. Chrysler served five responses, including objections to those requests. The Garcias filed three Motions to Compel Discovery and for Sanctions, and the parties participated in seven hearings on discovery disputes before three district judges. By the time the Sanctions Order was signed, Chrysler claims to have produced more than 80,000 documents, made 100,000 more available for inspection, and to have spent more than $250,000 in the process.[3] The parties have filed with this court twelve volumes of exhibits, including motions, responses, transcripts of hearings, correspondence, and affidavits, which they ask us to consider in assessing the propriety of the Sanctions Order.

The record reflects that the Garcias first served Chrysler with three discovery requests, including requests for admission, requests for production, and interrogato-

---

1. A trial on damages was scheduled for approximately three months later.

2. In *Transamerican Natural Gas Corp.* we held that

   when a trial court imposes discovery sanctions which have the effect of precluding a decision on the merits of a party's claims—such as by striking pleadings, dismissing an action, or rendering default judgment—a par-

   ty's remedy by appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final appealable judgment.

   *Id.* at 920.

3. At oral argument, Chrysler's attorney claimed that Chrysler had, by that time, produced 100,000 documents and spent in excess of $300,000 responding to the Garcias' discovery requests.

ries, to which Chrysler responded with answers and objections, leading to a hearing on the Motion to Compel Discovery on April 12, 1990. Admirably, the parties settled "probably 70 per cent" of their differences before the hearing, and submitted only the remaining issues for the court's determination. Ultimately, the parties submitted an Agreed Order On Motion to Compel Discovery to the trial court, which it signed on June 13, 1990, resolving all their differences on the Garcias' first, second, and third requests for discovery. The Agreed Order granted no sanctions.

On the same day that the trial court signed the parties' Agreed Order, the Garcias served Chrysler with Plaintiffs' Second Motion to Compel Discovery, Motion for Sanctions, and Motion for Entry of Order. The court convened a hearing on the Garcias' Second Motion to Compel on August 30, 1990. The "hearing," as it turned out, consisted of an announcement of counsels' agreement that Chrysler would identify a specific discovery request to which it claimed the documents it had produced were responsive; in return, the Garcias would then provide Chrysler with a list of contended deficiencies in Chrysler's production efforts. To this point, the tenor of the parties' relationship appears to have been accurately characterized by one of the Garcias' lawyers when he stated to the trial court that "some of our trouble may be more [of a] communication problem as opposed to an actual production problem."

However, discovery proceedings grew contentious in early 1991. On January 4, 1991, the Garcias filed Plaintiffs' Third Motion to Compel Discovery and Motion for Sanctions in which they complained of Chrysler's alleged failure to adequately respond to nineteen requests for production in Plaintiffs' Second Request for Discovery and three interrogatories contained in Plaintiffs' Third Request for Discovery. In its written response, Chrysler alleged that the Garcias had not pointed out gaps in

Chrysler's responses as agreed but instead had responded with a Motion for Sanctions. This resulted in Chrysler's accusation that opposing counsel was trying to set up a sanctions "tort." *See* William Kilgarlin, *Sanction for Discovery Abuse: Is the Cure Worse than the Disease?*, 54 Tex.Bar J. 659 (1991); Charles Herring, *The Rise of the "Sanctions Tort"*, Texas Lawyer, Jan. 28, 1991, at 22–23.

The hearing on Plaintiffs' Third Motion to Compel and Motion for Sanctions was held on February 15, 1991. The Garcias accused Chrysler of failing to comply with the Agreed Order, complaining primarily of Chrysler's failure to produce certain M-body crash tests,[4] a crash test index "that we know about that they haven't given us,"[5] an organizational chart, and information about Chrysler's document retention policies.[6] The sanctions requested included the striking of Chrysler's pleadings. The Garcias' counsel argued: "[W]hat is needed is punishment and it needs to be rather harsh, it needs to be harsh enough to get people's attention...." A harsh punishment would be appropriate, claimed the Garcias' counsel, because of Chrysler's lying and bad faith.

In response, Chrysler contended that it had produced everything that it was able to produce. For example, it contended that it had produced "some 100 crash test files" but that others, dating back more than six model years, had been destroyed pursuant to its document retention policy. Chrysler claimed that only if a crash test had been produced in other litigation and maintained in a case file would it be retained, but even then, not in the ordinary course of business.

Following a hearing that lasted approximately eight hours and consumed 196 pages of the record, the trial court signed an Order in which he denied Plaintiffs' Motion for Default Judgment, Plaintiffs' Motion to Strike Chrysler's Pleadings, and

---

**4.** At oral argument Chrysler's attorney claimed to have produced "approximately 250 or [sic] 300" crash tests in this case.

**5.** The Garcias' attorney at oral argument claimed that Chrysler had withheld 63 major frontal M-body crash tests.

**6.** Pursuant to its document-retention policy, Chrysler claims to have periodically destroyed certain of the requested documents in the ordinary course of its business.

Plaintiffs' Motion for Monetary Sanctions. The trial court did, however, order Chrysler to produce by April 1, 1991: (1) the crash test files and results, (2) unedited, computerized records of its entire crash-test index for all M-body type vehicles, and (3) affidavits detailing Chrysler's explanation for all requested documents that it claims were destroyed pursuant to its document retention policy. In the event that Chrysler failed to timely comply with his Order, Judge Dunham conditionally ordered a monetary sanction of $7,500 for each day it failed to do so.

Thereafter, the Garcias served Chrysler with their fourth discovery request. Chrysler's 28–page response raised objections to the request on both general and specific grounds, including the objection that some portions of the fourth request, containing 105 separate items for production, duplicated previous requests.

On March 29, 1991, Chrysler filed a Response to the trial court's Order, asserting that it was in compliance with that Order, and requesting a hearing on April 10, 1991, so that its compliance could be certified to avoid assessment of the $7,500 daily sanction conditionally ordered by Judge Dunham.[7] The hearing of April 10th, however, primarily involved Chrysler's objections to the Garcias' fourth request for discovery and spanned two days and 188 pages of the record. The anticipated hearing on Chrysler's Response to the trial court's Order was deferred until April 26, 1991, to be heard with Plaintiffs' Motion for Sanctions.

At the hearing on the Garcias' Motion for Sanctions on April 26, 1991, the primary concerns were crash test reports and Chrysler's electronic crash-test database. Counsel for the Garcias acknowledged that Chrysler did "provide a lot of stuff to us on April 1st" but stated that he had acquired from other sources[8] indices that referred to 245 M-body crash tests and that he had only received 191 crash test reports. In response, Chrysler claimed that crash test reports were destroyed pursuant to its document retention policy. But this could not be true, the Garcias' attorney retorted, because "some of the allegedly missing reports had been produced to other plaintiffs in other lawsuits during the same time that we've been trying to get them in this case and, therefore, clearly have not been destroyed."

Chrysler's attorney told Judge Blackmon that two other district judges had "already heard these issues." He pointed out that this lawsuit concerned a frontal impact to an M-body style vehicle—not side and rear-end impacts—and that the previous court ordered production was so limited. He also asserted that the difference between the lists of crash tests produced in other cases and those produced here was explained by Chrysler's document retention policy. Finally, he claimed that Chrysler had no way to locate all of the crash tests produced at other times in other lawsuits and should be required to produce only those maintained by Chrysler in the ordinary course of its business.

Ultimately, the trial court overruled all of Chrysler's objections and set the date for Chrysler's compliance with the Garcias' fourth discovery request for May 31, 1991.

On April 16, 1991, the Garcias filed an Amended Motion for Sanctions.[9] Chrysler

7. On the day before the hearing on April 10th, the Garcias' counsel transmitted by facsimile a Motion for Sanctions based on alleged misrepresentations made to the trial court at the hearing of February 15, 1991, but the hearing on this Motion was postponed until April 26, 1991.

8. For example, he acquired a crash-test master index for the years 1962 to 1978 from a 1978 deposition taken in another case. Another time, the Garcias' attorney called Chrysler a "liar" when it claimed that certain crash tests were destroyed, based on the affidavit of a Chicago area paralegal who claims Chrysler produced those tests recently in a case handled by her firm. Chrysler's attorneys later took her deposition to discover that the crash test reports in her file consisted of one page from each of three destroyed test reports and involved a non-M-body type vehicle, which was the subject of the paralegal's firm's case.

9. The Garcias' Second Amended Motion for Sanctions Against Chrysler for Discovery Abuse is really their fourth such motion. It alleges:

I.

Defendant Chrysler has engaged in a pattern and practice of discovery abuse in this case which includes:

(1) A long history of needless and obstreperous delay;

filed a 21–page response specifically denying each of the Garcias' contentions and asserting that the plaintiffs had themselves been guilty of discovery abuse related to Chrysler's discovery requests.

The final hearing on sanctions began on April 26, 1991, and occupies 129 pages of the record.[10] The Garcias' complaints at that time related to Chrysler's alleged failure to produce crash tests, a crash test index, an organizational chart, and certain seatbelt-related documents, and its alleged

(2) Needless delay in making discovery required by the Agreed Order of June 13, 1990;
(3) Leading opposing counsel to believe that discovery required by the Agreed Order of June 13, 1990 was completed when, in fact, it had not been completed;
(4) False statements that it had produced all crash tests which it was ordered to produce, when it had not;
(5) Failure to produce crash tests which it claimed had previously been destroyed when they had not been destroyed;
(6) Making false statements regarding discovery responses to the effect that it does not maintain a master crash test index, when it does maintain such an index;
(7) Making false statements through counsel to the Court that its master crash test index does not reflect whether crash tests reports have been destroyed, when the electronic crash test index which Chrysler maintains does contain such information;
(8) Failure to disclose 14 similar lawsuits responsive to Interrogatories Nos. 26 and 27;
(9) Failure to provide names and addresses of Plaintiffs' counsel and other identifying information regarding similar lawsuits in response to Interrogatories Nos. 26 and 27, notwithstanding Judge Dunham's Order of February 15, 1991;
(10) Failure to produce underlying data for compliance reports relevant to FMVSS 203, 204, and 207, contrary to the agreed production order;
(11) A continuing failure to produce Chrysler's document retention policies pursuant to which responsive documents "may" have been destroyed, and frivolously objecting to requests for their production;
(12) Falsely stating to the Court that it had produced Chrysler's document retention policies, when it had not;
(13) Additional failure to produce all M-body crash tests after being specifically ordered to do so by Judge Dunham's order of February 15, 1991;
(14) Massive failure to produce relevant and critical documents regarding Chrysler's testing of M-body seat belts and steering columns.

II.

Chrysler's conduct in this case constitutes a continuing pattern of discovery abuse which

failure to disclose all other lawsuits involving similar claims. Chrysler's attorney reiterated to the trial court his explanation for the discrepancy between references to crash tests in other lawsuits obtained by the Garcias' counsel and Chrysler's production in this suit:

What we are finding here and what I'm afraid will continue to happen throughout this entire case is that in some engineer's file somewhere at Chrysler Corporation or somewhere else, somebody back

required the imposition of sanctions pursuant to the provisions of Rule 215, Tex.R.Civ.P. Indeed, some of Chrysler's conduct violates Judge Dunham's Order of February 15, 1991, which specifically provided that failure to comply with the Order would result in sanctions of $7,500.00 per day pending full compliance.

10. By May 31st, Chrysler had produced 11,000 additional documents but asked for and received a 60–day extension at a hearing on June 21, 1991 as well as a limitation on the scope of the Garcias' fourth request for discovery. At the June 21, 1991 hearing, Judge Blackmon stated:

[I]'ll tell you something that's worrying me about the case, and it does worry me, and one of the reasons I haven't ruled on sanctions per se that I still have on my desk is we probably have already spent five or six days, we should have been trying this lawsuit. And we've had five or six days in pretrial things. *Plaintiff is obviously trying to posture the case so he can win the case in pretrial and does not have to try the lawsuit.*

\* \* \* \* \* \*

I am not in a position to say that lawyers are lying when they make representation in this Court in open court about what their clients can do or not do. I believe those representations are made in all good faith. \* \* \* [I]'m just not convinced that the lawyers here have done bad things and consequently, I'm not convinced that the Defendant here has done evil in—in regard to the discovery. \* \* \* I still don't know what I'm going to do with the sanctions, I just haven't made up my mind. One of you suggested some attorneys' fees and letting these fellas travel up somewhere. I thought that probably was the most reasonable suggestion. The problem is I'm going to have to have a hearing on attorneys fees, and I really don't want to do that. I would like to resolve that matter because I want to get the case to trial and try it.

Between April 26, 1991 to June 21, 1991, Chrysler compiled documents responsive to the Garcias' fourth discovery request. During this period, the Garcias' counsel served on Chrysler two additional requests for discovery.

then may have copied a piece of a crash test, maybe a page, may have made some notes about a crash test, may have actually—may have written a preliminary memo about a crash test that was ongoing that has the same number as one of those crash tests that is on our list of being shredded.

The trial court ultimately took the Motion for Sanctions under advisement. On May 10, 1991, the judge wrote to counsel expressing his opinion that discovery abuse had occurred and requesting their suggestions for appropriate alternative sanctions. Judge Blackmon then expressed his opinion that striking Chrysler's pleadings was too severe.

Chrysler responded that if sanctions were to be assessed, sanctions providing for an award of expenses, including reasonable attorneys fees, or an award of discovery expenses or court costs, would be appropriate. *See* Tex.R.Civ.P. 215(2)(b)(8) & (2). On the other hand, the Garcias recommended that the trial court prohibit Chrysler from calling any expert witness whose opinion was based on documents that had not been produced or that a fine of $292,-500 be assessed ($7,500 per day for 39 days) for alleged non-compliance with Judge Dunham's Order.

Finally, on August 8, 1991, Judge Blackmon announced his ruling on Plaintiffs' Request for Sanctions. He proceeded to grant the Garcias' request to strike Chrysler's pleadings and ordered that the case proceed to trial on damages alone because, as he said, he could think of no way to "quote divide the baby unquote." The trial court further ordered that Chrysler could not call expert witnesses regarding any aspect of liability at the trial on damages. Chrysler alleges that the Garcias' attorneys prepared the written Sanctions Order, which was signed that same day, without extending Chrysler's counsel an opportunity to review it or to lodge any objection to it before it was signed.

## II.

■ The legitimate purposes of discovery sanctions are threefold: 1) to secure compliance with discovery rules; 2) to deter other litigants from similar misconduct;

and 3) to punish violators. *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex.1986). However, discovery sanctions must also be "just." Tex.R.Civ.P. 215(2)(b); *Transamerican Natural Gas Corp.*, 811 S.W.2d at 917. Two factors mark the bounds of the trial court's discretion in order for sanctions to be just: first, a direct relationship between the offensive conduct and the sanction imposed must exist; and second, the sanction imposed must not be excessive. In other words, "the punishment should fit the crime." *Id.*

■ A permissible sanction should, therefore, be no more severe than required to satisfy legitimate purposes. This means that a court must consider relatively less stringent sanctions first to determine whether lesser sanctions will fully promote compliance, deterrence, and discourage further abuse. *Id.; Braden*, 811 S.W.2d at 929.

So, although punishment, deterrence, and securing compliance with our discovery rules continue to be valid reasons to impose sanctions, these considerations alone cannot justify a trial by sanction. Sanctions that by their severity, prevent a decision on the merits of a case cannot be justified "absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *Transamerican* at 918 (citation omitted). Even then, lesser sanctions must first be tested to determine whether they are adequate to secure compliance, deterrence, and punishment of the offender. *See id.*

## III.

■ We now measure the Sanctions Order by these standards. We conclude, for reasons that follow, that the trial court's actions failed to meet the *Transamerican* and *Braden* standards in four ways.

First, there is no direct relationship between the offensive conduct and the sanction imposed. As we stated in *Transamerican*, the sanction must be directed against the abuse and toward remedying the prejudice caused an innocent party. We do not doubt that a failure to produce documents can prejudice a party's efforts to assert or

defend a claim. But here, there has simply been no showing that the Garcias are unable to prepare for trial without the additional crash-test reports they seek. Furthermore, the record fails to demonstrate Chrysler's ability to produce the missing crash-test reports. There is no evidence in the record that the missing tests exist or are within Chrysler's possession, custody, or control, either actual or constructive. A party cannot be penalized for failure to produce documents under such circumstances. See TEX.R.CIV.P. 166b(2)(b).

The Garcias also contend that Chrysler failed to disclose all similar lawsuits, pointing to the omission of a single lawsuit. Chrysler explains that this omission occurred because the case was classified on its computer as an "air bag" case, rather than a "seatbelt" case. Once Chrysler was advised that the Garcias considered their request to include this type of suit, it made an additional search and disclosed ten air bag suits in advance of the April 1st deadline. The Garcias have made no showing as to how they have been hindered in their preparation for trial by this omission.

It seems obvious that the Garcias would be prejudiced by the expenditure of attorneys' fees and expenses in pursuing motions to compel discovery and sanctions. However, reimbursement of those expenses would appear to be better calculated to remedy such prejudice than would death penalty sanctions.

Second, striking Chrysler's pleadings and rendering a default judgment on liability is more severe than necessary to satisfy the legitimate purposes of sanctions for discovery abuse. Judge Blackmon himself conceded as much in his letter to counsel of May 10, 1991, requesting alternative sanction proposals.[11]

Third, no lesser sanction was first imposed. Although potentially exposed to a substantial daily fine, such fine was never imposed because there was no judicial determination that Chrysler failed to meet Judge Dunham's deadline for production of the items specified in his Order. Thus, we do not consider the conditional fine to be, as the Garcias argue, an imposition of a required lesser sanction.

■ Fourth, and perhaps most significantly, death penalty sanctions should not be used to deny a trial on the merits unless the court finds that the sanctioned party's conduct "justifies a presumption that its claims or defenses lack merit" and that "it would be unjust to permit the party to present the substance of that position [which is the subject of the withheld discovery] before the court." Transamerican, 811 S.W.2d at 918; Braden, 811 S.W.2d at 929. This record contains no evidence to justify such a presumption. In fact, the record conclusively refutes any such suggestion.[12] Nor do we find any evidence in the record of flagrant bad faith or counsel's callous disregard for the obligations of discovery.

IV.

In Braden, we held that in the event the trial court chooses to impose a substantial monetary sanction, unless the court defers payment until entry of final judgment, it should make express written findings, after a prompt hearing, articulating the reasons why the award does not impede a resolution of the case on the merits. Braden, 811 S.W.2d at 929 (citing Thomas v. Capital Security Serv., Inc., 836 F.2d 866 (5th Cir.1988)). We also noted the helpfulness of such findings that give the trial court's reasons for imposing severe discovery sanctions in Transamerican, 811

11. See supra p. 13.

12. In Chrysler's Request for Admission No. 6 to the Garcias, it asks them to "Admit that Oscar Garcia was negligent and that such negligence was a proximate cause of the accident on July 26, 1986 between he and Ambrocio Garcia," to which the Garcias responded, "Admitted."

In other words, the Garcias admitted that Chrysler was not the sole cause of the accident, but under Judge Blackmon's sanctions order,

Chrysler could contest only the amount of actual and punitive damages assessed, not liability, causation, or Oscar Garcia's comparative responsibility for the death of Ambrocio Garcia. If it had been allowed to try the issue of liability, Chrysler would not have been jointly and severally liable for Ambrocio Garcia's death if a jury assigned 80 per cent or more of the responsibility for Mr. Garcia's death to the drunk driver. See TEX.CIV.PRAC. & REM.CODE § 33.013(b)(1).

S.W.2d at 919 n. 9. Since then, courts of appeals have reviewed trial court findings regarding death penalty sanctions in at least two distinct ways. *See e.g. Hartford Accident & Ind. Co. v. Abascal,* 831 S.W.2d 559, 560 (Tex.App.—San Antonio 1992, orig. proceeding); *United States Fid. & Guar. Co. v. Rossa,* 830 S.W.2d 668, 672 (Tex.App.—Waco 1992, writ denied). This case also presents the question of what deference, if any, an appellate court must give such findings.[13]

13. Judge Blackmon's Sanctions Order includes the following findings:

*FINDINGS OF FACT*

1. The Court finds that Chrysler has engaged in a long-standing, continual, repeated and wilful abuse of the discovery process including, but not limited to, failure to comply with this Court's discovery orders entered on the 13th day of June, 1990, the 8th day of March, 1991, and the 11th day of April, 1991; said discovery abuse includes, but is not limited to, the following conduct:

a. REGARDING THE DISCOVERY ORDER ENTERED HEREIN ON JUNE 13, 1990, the Court finds:

1. Chrysler failed to produce in a reasonably timely manner numerous significant documents ordered produced by such Order;

2. Chrysler made false and misleading representations to the Court and to opposing counsel indicating that it had made full production of documents and was in full compliance with said Order, when it was not;

3. Chrysler made false representations to the Court that it did not maintain a Master Vehicle Crash Test Index, when it, in fact, did;

4. Chrysler failed to truthfully respond to discovery, and responded to discovery in a misleading and incomplete manner so as to conceal information detrimental to its case; and

5. Chrysler's unreasonable delay (more than 10 months) and its continual failure to produce documents it was required to produce under said Order, constitute gross violations of the Agreed Order;

b. REGARDING THE DISCOVERY ORDER ENTERED HEREIN ON MARCH 8, 1991, the Court finds:

1. Chrysler failed to timely and reasonably produce important documents ordered produced by such Order;

2. Chrysler represented to this Court and to opposing counsel that it had made full production of documents and was in full compliance with said Order, when it was not; and

3. Chrysler produced incomplete and redacted portions of documents in direct violation of such Order, and has failed to rectify such violation after being informed of the same;

c. REGARDING THE DISCOVERY ORDER ENTERED HEREIN ON APRIL 11, 1991, the Court finds:

1. Chrysler has failed to comply with the Orders of this Court regarding Request for Production No. 1 of Plaintiffs' Fourth Discovery to Defendant Chrysler, as it has, to this date, failed, refused and neglected to produce the information necessary for Plaintiffs to decipher and interpret the information contained within the computerized data base produced pursuant to this Court's orders; and

2. Such failure, neglect and refusal to produce the materials referenced in the preceding paragraph continued to this date despite letters from counsel for Plaintiffs requesting certain information which had been ordered to be produced by this Court's orders;

2. The Court finds that Chrysler, by and through its Houston counsel, has made repeated false and misleading statements to the Court and to opposing counsel regarding the status of discovery in this litigation, both in writing and in open court;

3. The Court finds that the imposition of monetary sanctions as included in the Court's Order of March 8, 1991, was ineffective in causing Chrysler to alter its pattern of misconduct; the Court finds that Chrysler has continued to engage in a continuing pattern of misconduct including discovery abuse and violations of this Court's orders following this Court's Order for monetary sanctions;

4. The Court finds that Chrysler is being represented herein by Corpus Christi counsel, Houston counsel and Washington, D.C. "National" counsel; the Court finds from the evidence that Chrysler itself, as well as its counsel, are fully aware of Chrysler's obligations and that the offensive conduct herein is attributable, in large part to Chrysler itself. The Court finds that the offensive conduct is not attributable in any part to Corpus Christi counsel. The Court finds that Chrysler itself, by and through its Discovery Manager Jeffery Podorsek and its National Counsel David Kikel, has been actively involved in the conduct at issue;

5. The Court has considered for almost three and one-half months the availability of less stringent sanctions and whether less stringent sanctions would fully promote compliance by Chrysler with this Court's discovery order; the Court had initially declined to strike Chrysler's pleadings and has been seeking to determine less stringent sanctions which could be expected to obtain proper compliance by Chrysler with this Court's orders and with the discovery rules; the Court notes that substantial monetary sanctions previously imposed herein on Chrysler had not successfully promoted full compliance with this Court's orders and that the pattern of misconduct has continued; the Court, reluctantly, finds that no sanction less stringent than those ordered herein will secure compliance with the Court's orders and applicable rules;

6. The Court finds that the discovery sought is directly, materially and substantially related to the major issues of the case; Chrysler's refus-

■ At least one court of appeals has gone so far as to order the trial court to make findings of fact and conclusions of law in support of its sanctions order under the *Transamerican* standard. *Hartford Accident & Ind. Co. v. Abascal,* 831 S.W.2d 559, 560 (Tex.App.—San Antonio 1992, orig. proceeding). In reviewing the trial court's order for sanctions in *Abascal,* the court held that the legal presumptions in favor of a judgment following a nonjury trial likewise applied to its review of the order for sanctions on mandamus, and that if any evidence supported the trial court's findings of fact, they were binding on the reviewing court. *Id.* at 561. Another court of appeals has varied this approach, holding that findings in the discovery context should not be treated like findings of fact made pursuant to Rule 296, which apply to appellate review of nonjury trials on the merits. *Rossa v. United States Fidelity & Guar. Co.,* 830 S.W.2d 668, 672 (Tex.App.—Waco 1992, writ denied).

In *Transamerican,* we noted merely that trial court findings would be "helpful" in assisting an appellate court in determining "that the trial court exercised its discretion in a reasonable and principled fashion." 811 S.W.2d at 919 n. 9. We did not mention Rule 296. Further, it is apparent that the standard of review articulated by the court of appeals in *Abascal* is not, in fact an "abuse of discretion" standard that we most recently restated in *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992), and which we apply here, but a legal and factual sufficiency standard of review applicable to appeals of nonjury trials. W. Wendell Hall, *STANDARDS OF APPELLATE REVIEW IN CIVIL APPEALS,* 21 ST. MARY'S L.J. 865, 919–20 (1990). Accordingly, we reject the approach used by the court of appeals in *Abascal* as incorrect and approve the approach of the court of appeals in *Rossa* as the correct approach.

■ Written findings that support the decision to impose such sanctions have at least three salutary effects: 1) such findings aid appellate review, demonstrating that the trial court's discretion was guided by a reasoned analysis of the purposes sanctions serve and the means of accomplishing those purposes according to the *Transamerican* and *Braden* standards; (2) such findings help assure the litigants, as well as the judge, that the decision was the product of thoughtful judicial deliberation; and (3) the articulation of the court's analysis enhances the likely deterrent effect of the sanctions order. *See Thomas v. Capital Sec. Servs., Inc.,* 836 F.2d 866, 883 (5th Cir.1988) (citation omitted). But we do not wish to unnecessarily burden our trial courts by requiring them to make written findings in all cases in which death penalty sanctions are imposed. First, the benefit of the trial court's explanation in the record of why it believes death penalty sanctions are justified may be sufficient to guide the appellate court. Second, written findings are not needed in the vast majority of relatively uncomplicated cases or even more complex cases involving only a few issues pertinent to the propriety of death penalty sanctions. We doubt that findings in such cases would meaningfully assist appellate review.

There are even instances when extensive findings in support of a sanctions order cannot be considered helpful to appellate review. This suit falls into that category. Although the trial court made extensive findings, only two appear pertinent to the *Transamerican* standards: whether Chrysler's discovery abuse justifies the presumption that its defenses to the suit lack merit; and, whether the conditional monetary sanctions order of March 8, 1991 can be fairly characterized as a lesser sanction. We have reviewed the entire record

---

al to comply with the discovery rules and orders of this Court prevent Plaintiffs from preparing their case for trial and preclude a fair trial under applicable law;

7. Although the Court fully recognizes the severity of the sanctions ordered herein, Chrysler's longstanding and flagrant discovery conduct in this case can only be described as a wilful failure to comply with its responsibilities

of discovery under our state's Rules of Civil Procedure and orders of this Court. Such a callous disregard for its responsibilities therein will not be tolerated by this Court;

8. Chrysler's lengthy and continuous obstruction of Plaintiffs' discovery efforts clearly justifies the presumption held by this Court that Chrysler believes its defenses to Plaintiffs' allegations lack merit.

and conclude that it contains no evidence that would justify the presumption of lack of merit of Chrysler's defense;[14] further, we conclude that the conditional monetary sanctions order is not the type of lesser sanction required before the imposition of death penalty sanctions, which we contemplated in *Transamerican*. We, therefore, hold that the trial court abused its discretion by ordering death penalty sanctions under the circumstances of this case. While trial court findings in a death penalty sanctions case can be helpful in demonstrating how the court's discretion was guided by a reasoned analysis of the purposes sanctions serve and the means of accomplishing those purposes, especially in complex cases where the record is voluminous, such findings must be pertinent to the *Transamerican* standards and supported by the record. Findings specifically tied to an appropriate legal standard are the only type of findings that can be truly beneficial to appellate review.[15]

\* \* \*

For the reasons we have explained, we trust that the trial court will vacate its Sanctions Order of August 8, 1991. The clerk is instructed to issue the Writ of Mandamus to compel such action only in the event the trial court declines to voluntarily do so.

GONZALEZ, MAUZY, DOGGETT and GAMMAGE, JJ., note their dissent.

14. See *supra* at n. 12.

15. As we have previously stated, the court has appointed various task forces to study and recommend any needed revisions in the Rules of Civil Procedure, including the rules relating to sanctions. *See Alvarado v. Farah Mfg. Co., Inc.,* 830 S.W.2d 911 (Tex.1992). We anticipate that the task forces' recommendations will include proposals relating to trial court findings in death penalty sanctions cases.